UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORY V. SERIO, not individually, but in his capacity as Rehabilitator of Frontier Insurance Company, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 03 C 7608 |
| CLER, INC., a dissolved Illinois corporation; EDWARD FORTE; and CORDIA FORTE, | ) Judge John W. Darrah<br>)<br>) |
| Defendants. | ) |

## OPINION AND ORDER

This matter comes on for ruling following a bench trial between the parties. Plaintiff, Gregory V. Serio, in his capacity as Rehabilitator of Frontier Insurance Company, filed suit against Defendants, Cler Inc., Edward Forte, and Cordia Forte. Plaintiff, who acted as surety on construction projects undertaken by Defendants, seeks payment for losses incurred as surety for Cler on two construction projects. Defendants do not dispute that they were parties to an indemnity agreement or that Plaintiff incurred and paid out the claimed losses. Instead, Defendants argue that: (1) Plaintiff unnecessarily stopped one of the construction projects, which caused all the damages Plaintiff claims; and (2) Plaintiff incurred unreasonably excessive expenses in completing the construction projects.

The Court has considered the evidence, including the exhibits and testimony of witnesses, and has further considered the written arguments and proposed findings of fact and conclusions of law and the authority cited therein submitted by counsel for the parties. The Court has also

considered the witnesses' intelligence, memory, ability and opportunity to observe, manner while testifying, any interest, bias, or prejudice of the witnesses, and the reasonableness of the witnesses' testimony when considered in light of all the evidence in the case.

## **FINDINGS OF FACT**

Cler was a corporation that acted as a general contractor for construction projects. Cler; Edward Forte (President of Cler) both personally and in his corporate capacity; and Cordia Forte, personally, executed a General Agreement of Indemnity in exchange for surety bonds provided by Plaintiff. That agreement provided, in pertinent part, that:

> 2. [Defendants] will indemnify and save [Plaintiff] harmless from and against every claim, demand, liability, cost, charge, suit, judgment and expense which [Plaintiff] may pay or incur in consequence of having executed, or procured the execution of, such bonds, or any renewals or continuations thereof or substitutes therefor, including fees of attorneys, whether on salary, retainer or otherwise, and the expense of procuring, or attempting to procure, release from liability, or in bringing suit to enforce the obligation of any of [Defendants] under this Agreement. In the event of payment by [Plaintiff], [Defendants] agree to accept the voucher or other evidence of such payment as prima facie evidence of the propriety thereof, and of the [Defendants'] liability therefor to [Plaintiff]. . . .
>
> 5. [Plaintiff] shall have the exclusive right to determine for itself and [Defendants] whether any claim or suit brought against [Plaintiff] or the Principal upon any such bond shall be settled or defended and its decision shall be binding and conclusive upon [Defendants].
>
> 6. If such bond be given in connection with a contract, [Plaintiff] is hereby authorized, but not required, to consent to any change in the contract or in the plans or specifications relating thereto; to make or guarantee advances or loans for the purposes of the contract without the necessity of seeing to the application thereof, it being understood that the amount of all such advances or loans, unless repaid with legal interest by the Contractor to [Plaintiff] when due, shall conclusively presumed to be a loss hereunder; in the event of the abandonment, forfeiture or breach of the contract, or the breach of any bond given in connection therewith, or the failure, neglect, or refusal to pay for labor or materials used in the prosecution of the contract, to take possession of the work under the contract and, at the expense of [Defendants], to complete the contract, or cause, or consent

2

to the completion thereof. [Defendants] hereby assign, transfer, and set over to [Plaintiff] (to be effective as of the date of any such bond, but only in the event of a default as aforesaid), all of their rights under the contract, including their right, title and interest in and to all subcontracts let in connection therewith; all machinery, plant, equipment, tools and materials which shall be upon the site of the work or elsewhere for the purposes of the contract, including all materials ordered for the contract, and any and all sums due under the contract at the time of such abandonment, forfeiture, breach, failure, neglect or refusal, or which may thereafter become due, and [Defendants] hereby authorize [Plaintiff] to endorse in the name of the payee, and to collect any check, draft, warrant or other instrument made or issued in payment of any such sum, and to disburse the proceeds thereof. . . .

17. At any time, and until such time as the liability of [Plaintiff] under any and all said Bonds is terminated, [Plaintiff] shall have the right to reasonable access to the books, records, and accounts of the [Defendants]; and any bank depository, material man, supply house, or other person, firm or corporation when requested by [Plaintiff] is hereby authorized to furnish [Plaintiff] any information requested including, but not limited to, the status of the work under contracts being performed by [Defendants], the condition of the performance of such contracts and payments of accounts.

18. In the event of any breach, delay or default asserted by the [City of Chicago] in any said Bonds, or the Contractor has suspended or ceased work on any contract or contracts covered by any said Bonds, or failed to pay obligations incurred in connection therewith, or in the event of the death, disappearance, Contractor's conviction for a felony, imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or the property of the Contractor, or in the event of an assignment for the benefit of creditors of the Contractor, or if any action is taken by or against the Contractor under or by virtue of the National Bankruptcy Act, or should reorganization or arrangement proceedings be filed by or against the Contractor under said Act, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States, [Plaintiff] shall have the right, at its option and in its sole discretion, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by any said Bonds, and at the expense of the Contractor and [Defendants] to complete or arrange for the completion of the same, and the Contractor and [Defendants] shall promptly upon demand pay to [Plaintiff] all losses, and expenses so incurred.

19. . . . WE HAVE READ THIS GENERAL AGREEMENT OF INDEMNITY CAREFULLY, THERE ARE NO SEPARATE AGREEMENTS OR UNDERSTANDINGS WHICH IN ANY WAY LESSEN OUR OBLIGATIONS AS ABOVE SET FORTH.

Plaintiff issued surety bonds for two construction projects for the City of Chicago (" the City") undertaken by Cler: (1) the Woodson Library Project and (2) the Central South Side Project. These surety bonds provided that if Cler was unable to perform its obligations with the City of Chicago, subcontractors, or other persons furnishing material or labor, Plaintiff was obligated to pay those claims.

Cler was awarded the Woodson Library Project on April 30, 1996; and the City set May 20, 1996 as the construction start date on the one-year project. Cler's schedule of activities was filed with the City seven weeks late; and Cler did not begin the job until August 28, 1996.

Cler failed to hire an electrical subcontractor until late September 1996; as a result, a problem involving electrical construction and Cler's electrical plan, which did not meet the requirements of the City code, was not timely discovered. Cler sought to modify the Woodson Library contract to purchase electrical equipment needed to remedy the electrical problem, but Cler's proposal was rejected by the City as too expensive. In March 1997, while attempting to obtain a final, authorized contract modification for the electrical equipment, Cler delivered a check to its electrical subcontractor with insufficient funds for payment. The subcontractor refused to purchase the electrical equipment without payment, although Cler had told the City that the electrical equipment was ordered. Nonetheless, the City attempted to resolve the electrical equipment issues with Cler. Although Cler was required and was directed to continue

working on the Woodson Library Project while contract modification proposals were awaiting authorization, Cler refused to continue work. The project's completion date was pushed back by the City from May 20, 1997 to November 30, 1997.

Cler was required to request progress payments from the City on a monthly basis for expenditures incurred and to pay Cler's subcontractors in a timely fashion. Cler's first request for payment was submitted almost four months after the project's proposed start date and subsequent payment requests were not filed on a monthly basis. Cler also failed to submit proper documentation for progress payment requests, thus delaying payment from the City. As a result, subcontractors and vendors began complaining that they had not been paid for work performed on the Woodson Library Project. Cler understaffed the project, as well. A full-time project manager was not used, as required; and a part-time, incompetent project manager was eventually terminated. As a result, the project was not completed until January 1998.

Plaintiff received a "Notice of Claim Against Bond" from Precision Metals, Inc.; and Plaintiff sent Defendants letters demanding resolution of this claim and fulfillment of Defendants' duties of indemnification and exoneration under the General Agreement of Indemnity. Plaintiff also received a Notice of Claim Against Bond from Will-Rent, Inc. Plaintiff, after notifying Defendants of these claims and not receiving a response, asked the City to insure that contract funds were paid to satisfy claims arising on the project.

Plaintiff then asserted its rights in the remaining contract funds and; consequently, Cler was not paid the money it sought in payment application number nine. Payment application number nine sought a progress payment from the City for work finished by Cler and its subcontractors, and Cler would have used the payment to pay a number of its subcontractors.

5

Plaintiff later allowed the City to release contract funds for payments to subcontractors, provided the City guaranteed that funds would actually go to subcontractors, to whom payment was overdue.

Thereafter, the City began the construction contract-mandated procedure to terminate the Woodson Library Contract. The City issued letters to Cler notifying it of the City's intent to default and terminate the contract, but Cler made no attempt to cure the default or resolve the City's complaints. Instead, Cler filed for bankruptcy protection. On October 30, 1997, the City terminated the contract and demanded Plaintiff perform under the Woodson Library bond. Defendants, through a letter from their attorney, authorized Plaintiff to investigate the claims made against the bonds, as the City had requested.

Marc Roth was hired by Plaintiff in September 1997 to complete the investigation, and he reviewed the relevant project and contract documents. Roth also inspected the project site on several occasions; attended project meetings; and conducted personal interviews with Plaintiff, the City, subcontractors, potential general contractors to complete the project, and Cler's employees. According to Roth's report, the City was partly responsible for the earlier electrical equipment issue by requiring the project to comply with certain code requirements but failing to timely provide an electrical plan. The report further noted that, as of November 4, 1997, the electrical equipment was on site but that the electrical subcontractor would not install the equipment until a contract modification was authorized. No further work could be completed until resolution of this issue.

Roth's analysis also found that Cler owed more to subcontractors than Cler was owed by the City: Cler owed approximately $450,000.00, yet the City had approved a lesser amount to pay out these claims. Roth also found that Cler: (1) was late in filing important documents, (2) filed incomplete and inaccurate documents, (3) failed to submit timely reports, (4) bounced a check to a subcontractor, and (5) was late in beginning the job. Roth further determined that a number of lien claims had been filed against Cler by subcontractors and other entities working on the Woodson Library Project. Roth noted that the City could seek liquidated damages if the project was not timely completed, and the City intended to enforce other penalties. After examining possible defenses available to permit Plaintiff to deny the City's bond claim, Roth's report concluded that Plaintiff was not entitled to deny the bond claim. Plaintiff's attorney reached the same conclusion and concluded the bond provided a waiver of a "material change" defense which prevented Plaintiff from raising the City's misconduct regarding the electrical equipment issue, which otherwise would have been available.

During Roth's investigation, the City asked Plaintiff to take action under the bond. The City also threatened to assert a claim for liquidated damages of $1,000.00 per day for every day the Woodson Library Project was delivered past the revised deadline of November 30, 1997. While the City initially refused to discuss liquidated damages, the City eventually granted additional time extensions; and Plaintiff did not pay liquidated damages to the City. The City also assessed a penalty against Cler of over $170,000.00, but Plaintiff negotiated a reduction to $18,509.95.

Plaintiff chose a general contractor, Oakley Construction, Inc. ("Oakley") to complete the project after a competitive bid process. Plaintiff and Oakley executed a takeover agreement; and Plaintiff secured additional time extensions and contract modifications from the City, which increased the value of the takeover agreement. The modifications also addressed issues raised by Cler prior to the default, including the electrical equipment problem.

The original value of the Woodson Library Project was $2,338,426.00. Before Cler was terminated from the project, it had been paid $1,003,850.13. After contract modifications of an additional $729,419.54, the total value of the contract was worth $3,067,845.54. The remaining balance to be paid on the contract, after modication, after Cler's termination, was $2,063,995.41. After deducting the $18,509.95 penalty, $2,045,486.46 was due Plaintiff. However, Plaintiff could not account for $37,991.85 of this amount claimed; and, therefore, Plaintiff received a total of $2,007,493.61 from the City. This amount included $273,458.88 Plaintiff received from the City for payment application nine due Cler's subcontractors. The total Plaintiff received from the City and the amount paid to Cler equaled the modified contract price of $3,067,845.46.

Plaintiff paid Oakley $1,968,241.77 for its role as general contractor in the project. Plaintiff also paid the City $10,982.93 for security services on the project during the period between Cler's termination and Oakley's takeover.

Plaintiff received numerous claims from subcontractors, labor suppliers, and material suppliers of Cler seeking payment for work done under Cler. To facilitate continued participation of subcontractors, Plaintiff executed a number of ratification agreements with subcontractors. These agreements required Plaintiff to pay the subcontractors for work they had

performed but were not paid by Cler. Roth reviewed these claims and claims by other subcontractors and the supporting documentation and recommended whether or not Plaintiff should accept a claim.

After examining the supporting documentation, Plaintiff paid claims to fifteen parties, as follows: (1) $21,217.05 to Pinto Construction Group, Inc.; (2) $49,000.00 to Hill Mechanical Group; (3) $28,269.00 to Elens & Maichin Roofing, Inc.; (4) $6,939.45 to Dover Elevator Co.; (5) $3,150.00 to Accurate Custom Cabinets; (6) $4,635.90 to All Sealants, Inc.; (7) $9493.20 to Fox Valley Fire & Safety Co.; (8) $176,498.28 to E-Quality Electric, Inc.; (9) $20,670.30 to W.F. Thomas Plumbing Co.; (10) $23,067.00 to Precision Metals, Inc.; (11) $22,652.58 to K & K Iron Works; (12) $17,294.00 to Wilkin Insulation Co.; (13) $17,034.00 to Stone Panels, Inc.; (14) $4,350.30 to Will Rent, Inc.; and (15) $20,000.00 to Sherry-K Corp. In total, Plaintiff paid these parties $424,271.06.

After adding the $2,007,493.61 in contract payments Plaintiff received from the City and the $37,991.85 in contract funds for which Plaintiff cannot account and thus credits to Defendants, Plaintiff credited Defendants a total of $2,045,485.46. After deducting the $1,968,241.77 Plaintiff paid Oakley, the $10,982.93 Plaintiff paid the City, and the $424,271.06 paid to the fifteen claimants, Plaintiff's total loss on the Woodson Library Project is $358,010.30.

Under the bond Plaintiff provided for the second construction contract, the Central South Side project, Plaintiff paid Bigane Paving Company $44,792.00. Defendants do not contest liability as to this claim.

Plaintiff incurred a number of expenses in investigating the claims and hiring consultants and attorneys to enforce Plaintiff's rights under the general agreement of indemnity for both projects. The following amounts were paid: (1) $10,714.99 to Harris, Beach, & Wilcox for legal and investigative services; (2) $55,254.41 to Riordan, Donnelly, Lipinski, & McKee, Ltd. for legal and investigative services; (3) $51,888.03 to MNM Surety Consultants, Inc. for surety and construction investigative and consulting services; and (4) $1,908.25 for Optima Security Services, Inc. for investigation of Defendants' financial condition. These fees total $119,765.68. This does not include any fees which Plaintiff has yet to pay, including costs for this trial.

## CONCLUSIONS OF LAW

Under Illinois law, an indemnity agreement is treated like any other contract. *E.g., Fid. & Dep. Co. v. Marian Prof'l Constr., Inc.*, No. 99 C 6787, 2004 WL 1718655, at *4 (N.D. Ill. July 29, 2004) (*Fid & Dep. Co.*). The plain language of the indemnity agreement controls unless the agreement is ambiguous. *E.g., Fid & Dep. Co.*, 2004 WL 1718655, at *4. A surety's right to indemnity may be limited by affirmative defenses, such as: (1) the surety acted with fraud, (2) the surety acted in bad faith, and (3) the surety failed to mitigate damages. *See Cont'l Cas. Co. v. Gutherman*, 708 F. Supp. 953, 954 (N.D. Ill. 1989); *Mountbatten Sur. Co. v. Szabo Contracting, Inc.*, 812 N.E.2d 90, 102-04 (Ill. App. Ct. 2004); *United States Fid. & Guar. Co. v. Klein Corp.*, 558 N.E.2d 1047, 1050-51 (Ill. App. Ct. 1990). The party asserting the affirmative defense on the contract issues has the burden of proof. *See ABC v. Maljack Productions, Inc.*, 34 F. Supp. 2d 665, 675-76 (N.D. Ill. 1998); *RIV VIL, Inc. v. Tucker*, 945 F. Supp. 645, 660 (N.D. Ill. 1997).

## **DECISION**

Defendants do not contest that they were parties to the general agreement of indemnity. Paragraph two of the agreement clearly and unambiguously provides that Defendants will indemnify Plaintiff from all costs Plaintiff incurs in consequence of having executed the bonds, including attorneys' fees. The general agreement of indemnity also clearly and unambiguously provides that Plaintiff may assume all rights under the contract with the City if Cler breached, defaulted, failed to pay obligations, delayed, or was terminated from the contract by the City. The general agreement of indemnity further clearly and unambiguously provides that, in the event of a breach, termination, or default by Cler with its contract with the City, Plaintiff may: (1) take rights under all subcontracts; (2) take all machinery, equipment, tools, labor and materials; (3) take any and all sums due under the contract at the time or which may thereafter become due; (4) disburse proceeds of the contracts; (5) at the expense of Defendants, complete or arrange for the completion of the work.

Defendants do not argue to the contrary. Instead, Defendants contend that: (1) Plaintiff acted in bad faith or otherwise failed to mitigate damages when it interceded and stopped Cler from receiving payment on request number nine from the City so that Cler could not pay its subcontractors, thus bringing the Woodson Library Project to a halt. (2) Plaintiff paid unreasonable and excessive amounts to subcontractors once Plaintiff assumed control of the Woodson Library Project. (3) The amount Cler purportedly sought in payment application number nine, $379,896.98, should be deducted from Plaintiff's damages. (4) Plaintiff double-charged legal expenses for work done in connection with the Central South Side Bond.

11

Defendants argue that Plaintiff acted in bad faith or otherwise failed to mitigate damages when Plaintiff interceded and stopped Cler from receiving payment number nine from the City, thus preventing Cler from paying its subcontractors who had completed work on the project. According to Defendants, the City was responsible for the delays on the Woodson Library Project, and Plaintiff's action prevented Cler from paying its subcontractors.

Defendant Edward Forte testified that the project was delayed because: (1) before Cler started working, the City failed to take steps to coordinate with various City departments and complete paperwork to close off an alley necessary for the project; and (2) Cler was not timely paid even though he submitted payment applications on a monthly basis because the City disagreed with certain costs assessed by Cler that could not be resolved until the next regular monthly meeting between the parties. Edward Forte's testimony in these regards was not credible. Defendants presented no documentation to support these claims, and Edward Forte's explanation that he strategically decided not to file complaints or keep paperwork so that he would not be hurt in future dealings with the City is not credible. Furthermore, the City's records of payment applications received from Cler showed many of which were received late and/or included improper and inadequate documentation to support the charges claimed by Cler.

Edward Forte's testimony was not credible in other material respects, as well. Edward Forte testified that he met with Roth in July 1997, but Roth did not begin working on the project until September 1997. Edward Forte also could not explain why an attorney for Cler, in a letter, authorized Plaintiff to investigate the bond claim despite Edward Forte's insistence that no attorneys represented Defendants during the Woodson Library bond dispute. Edward Forte further testified that he spoke to Plaintiff's attorney, Cornelius Riordan, during October 1997.

12

However, Riordan's testimony and time-sheets indicate that he never spoke to Edward Forte in October 1997 or anytime thereafter in the next two-and-a-half years. Riordan's testimony was completely credible and unimpeached.

Defendants also argue that the project was delayed because City employees failed to account for the electrical problem. According to Defendants, Marc Roth agreed that no further work could have been accomplished on the project without resolution of the electrical issue. Roth's report further stated that although the necessary electrical equipment was ready for installation, the electrical subcontractor would not begin work until the contract modification was authorized. However, Cler was also responsible for the problems with the electrical equipment. As detailed above, Cler: (1) began on the job late and hired the electrical subcontractor late, thereby delaying the discovery of the electrical problem; (2) Cler provided the electrical subcontractor a check which was dishonored because of insufficient funds, which delayed the purchase of the electrical equipment; and (3) Cler told the City the electrical equipment was ordered even though it was not.

Cler was responsible for other delays and problems which delayed the project's proposed finish date. Cler failed to use a full-time project manager, and the incompetent part-time project manager was eventually fired. Further, as set out in the findings above, Cler: (1) failed to submit its first monthly payment application until four months after the project's scheduled start date; (2) failed to submit progress payments on a monthly basis; and (3) failed to submit proper documentation in support of the monthly progress payments. Plaintiff received two notices of claim against the bond from a subcontractor and a material provider, indicating a refusal to pay by Cler in violation of paragraph six of the general agreement of indemnity. Defendants argue

13

that the claim submitted by Will-Rent was improper because rental companies cannot file mechanic's liens. However, even if Will-Rent filed a mechanic's lien, as opposed to a claim against the bond that was actually filed, Illinois law allows lessors to file mechanic's liens for non-payment of rental charges. *Aluma Sys., Inc. v. Frederick Quinn Corp.*, 564 N.E.2d 1280, 1296 (Ill. App. Ct. 1990). Furthermore, paragraph six of the general agreement of indemnity requires that Cler pay for all materials used in the project and, therefore, includes claims for leased materials.

Accordingly, Defendants have not demonstrated Plaintiff acted in bad faith or otherwise failed to mitigate damages when Plaintiff interceded and stopped Cler from receiving payment number nine from the City. The project was not on schedule, subcontractors and material providers were not being paid, and the City was threatening to impose liquidated damages of $1,000.00 per day for each day the project was late. Plaintiff's intercession, at the request of the City, allowed Plaintiff to: (1) obtain a later project completion date, (2) obtain a waiver of liquidated damages, (3) make overdue payments to subcontractors, (4) guarantee the continued participation of subcontractors, and (5) ensure a successful completion of the Woodson Library Project with a replacement contractor.

Defendants next argue that Plaintiff paid improper and excessive amounts to subcontractors once Plaintiff assumed control of the Woodson Library Project. Defendants specifically challenge two payments made by Plaintiff to Will-Rent and Sherry-K. Defendants also contend that Plaintiff paid $424,271.06 in unnecessary funds to subcontractors who should have received payments from Cler's payment application number nine; the City was supposed to pay Cler money in this application so that Cler could pay these subcontractors.

14

Defendants argue that the payment to Will-Rent was improperly made as Cler leased materials from Will-Rent and was not provided labor or materials. But, as discussed above, Will-Rent's claim is covered by the general agreement of indemnity. Defendants also argue that Will-Rent's claim and Sherry-K's claim were not included in any of Cler's application for payments; therefore, these two entities were not proper subcontractors on the project. However, whether Cler submitted payment applications for these entities is not dispositive as to whether or not Plaintiff properly paid these amounts. Will-Rent and Sherry-K both submitted documentation that indicated each had performed labor or supplied materials to the Woodson Library Project at Cler's request.

Defendants further contend that Plaintiff paid $424,271.06 in unnecessary funds to subcontractors who should have received payments from Cler's payment application number nine. However, Plaintiff has documented each payment received from the City and each claim paid. Under paragraph two of the general agreement of indemnity, this documentation is *prima facie* evidence of the propriety of Plaintiff's claim. Defendants have presented no evidence to the contrary.

Defendants also argue that Cler's payment application number nine was worth $379,896.98 instead of $314,296.98, and this amount should be deducted from Plaintiff's damages. While Cler may have submitted such an application, Plaintiff has provided documentation that the City certified and paid a lesser amount; and Defendants have no evidence that the City actually paid the higher amount sought by Cler. Even if payment application number nine was worth the higher amount sought by Cler, $379,896.98 would not be deducted from Plaintiff's damages. As detailed above, after including the assessed penalty and the amount

Plaintiff credited Defendants, the City paid and Plaintiff received the full remaining balance on the contract. Therefore, whether payment application number nine was worth $379,896.98 or $314,296.98 is irrelevant.

Based on the calculations set out above, Plaintiff is awarded the amount of its loss on the Woodson Library Project pursuant to the indemnification agreement, $358,010.30.

Defendants do not contest that they are liable for $44,792.00 Plaintiff expended on the Central South Side Project, and that amount is awarded to Plaintiff.

Finally, Defendants contest an expense Plaintiff incurred in seeking indemnification under the bonds. According to Defendants, Plaintiff double-charged legal expenses for work done in connection with the Central South Side bond. Defendants argue that Plaintiff lists $8,108.59 in legal expenses for both the Central South Side Project and Woodson Library Project for identical dates. However, according to testimony and exhibits, Plaintiff's attorneys issued one combined monthly statement for work performed on both projects. The payments to the consultants and attorneys were split, with half being applied as an expense payment towards the Woodson Library Project and half being applied as an expense payment towards the Central South Side Project.

Accordingly, Plaintiff is awarded the full amount of costs, fees, and expenses sought in investigating the claims and hiring consultants and attorneys to enforce Plaintiff's rights under the general agreement of indemnity for both projects of $119,765.68.

## CONCLUSION

For the foregoing reasons, judgment is entered in favor of Plaintiff and against Defendants. Plaintiff is awarded $552,567.98. A status hearing is set for September 20, 2005 for presentation of Plaintiff's motion for costs and expenses incurred for trial.

Date: August 24, 2005

John W. Darrah, Judge
United States District Court